## THE ILLINOIS.

### BALANO et al. v. THE ILLINOIS.

(Circuit Court of Appeals, Third Circuit. April 27, 1898.)

No. 10.

1. COLLISION—TUG WITH TOW—STARTING FROM DOCK.

A tug starting out into the Delaware river, from behind piers which obstruct her view, with a tow on a hawser, must exercise caution, but is not bound absolutely to ascertain beforehand whether any vessel is approaching; and where she gives the proper signal to enable a vessel actually approaching to avoid the tow by proper and reasonable navigation, she is not to be held liable for a collision between them.

2. SAME—STEAMSHIP IN CHANNEL.

Where a schooner towed by a tug on a hawser was struck in the Delaware river, by a passing steamship, shortly after the tug and steamer had emerged from behind piers that obstructed their view, held, that the steamship was solely at fault, in that, while proceeding in a narrow channel, where vessels and tows were likely to be encountered, she failed to perform her duty of running slowly, keeping a careful lookout, and listening attentively for signals.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

This was a libel in rem by James W. Balano, master of the schooner Mabel Jordan, against the steamship Illinois, whereof the International Navigation Company was owner, to recover damages caused by a collision. The tug Gladisfen was subsequently made a co-defendant, on the petition of the claimant of the Illinois. The district court, after a final hearing on the merits, found the Illinois solely in fault, and decreed accordingly. 65 Fed. 123; 84 Fed. 697. The claimant thereupon appealed to this court.

N. Dubois Miller, for appellant.

John F. Lewis, for the Mabel Jordan.

Henry R. Edmunds, for the Gladisfen.

Before ACHESON and DALLAS, Circuit Judges, and BRADFORD, District Judge.

DALLAS, Circuit Judge. The schooner Mabel Jordan was run into and sunk by the steamer Illinois on June 9, 1893; and, upon the latter being libeled for the loss, her owners filed a petition under which the Gladisfen, a steam tug which at the time was engaged in towing the schooner, was made co-respondent. Unquestionably, the collision was occasioned by negligence either of the steamer, or of the tug, or of both. The court below held that it resulted wholly from fault of the former; and it is now insisted that this conclusion was erroneous, because, as is alleged in the petition of the Illinois—

"Those in charge of said steam tug Gladisfen were in fault as follows: (1) In towing said schooner out into the channel, from behind the covered piers, without giving proper and lawful signals to approaching vessels. (2) In towing the schooner into the channel, from behind the covered piers, without ascertaining whether any vessels were approaching. (3) In not keeping a vigilant outlook, and failing to observe the steamship Illinois in time to avoid the collision. (4) In towing the schooner Mabel Jordan into the channel with a hawser of excessive length. (5) In cutting the hawser by which the schooner was being towed. (6) By conducting and managing said towage service so negligently, carelessly, and unskillfully that the collision occurred."

In so far as it is possible to regard these allegations as being well founded in law, they were not only unsupported by proof, but the weight of the evidence was clearly against them.

1. The fact that the tug, in towing the schooner out into the channel, gave the "proper and lawful signals," was established by abundant testimony. When starting from the dock, and before emerging from behind the piers, she whistled, as is customary, to give notice of her approach to all vessels which might be moving either up or down that part of the river; and when she passed outside of the dock, and sighted the Illinois, she immediately signaled that vessel to pursue a course which, if followed, would have averted the disaster.

2. It was the duty of the Gladisfen to be cautious in moving out from behind the piers, but she was not required to absolutely ascertain whether any vessels were approaching. She was bound to be careful, but not to insure safety. Therefore the second of the allegations of the petition sets up a false standard of liability; and, because it charges no specific wrongful act or omission, it presents no distinctive question of fact for consideration.

3. We are fully convinced that a proper lookout was maintained at the bow of the Gladisfen, and that the Illinois was observed promptly and without delinquency.

4. The proofs conclusively establish that the towing hawser was not of excessive length.

5. The cutting of the hawser did not in the slightest degree contribute to cause the collision. It was entirely proper to cut it at the time it was cut, with the object which induced the cutting.

6. The last allegation asserts, in general terms, that the tug was in fault in its conduct and management of the towage; and with reference to this broad averment, but without needless prolixity, the case will be further considered. The schooner which was sunk was laden with coal, and was lying in the dock at Greenwich Piers, on the west side of the Delaware river. Her intended course was down the river. She was in tow of the Gladisfen, which, in starting to draw her from the dock, gave the customary signal,—a long blast of the whistle. The view from vessels within the dock, and of such vessels from the river, was much obscured by the adjacent covered piers. When the bow of the Gladisfen came beyond the outer line of these piers, the Illinois was seen to be coming down the channel, and the Gladisfen signaled to her to pass to the westward of the tow. The tide was running up, and when the schooner came out into the river she was carried upward, and to the eastward. The tug was headed down the river, and the schooner, being then subject to the influence of the slack hawser, and also to the antagonistic force of the tide, was, practically speaking, not moving. It is contended on behalf of the Gladisfen that the schooner, before being struck, had passed over to the eastward side of the channel, while for the Illinois it is insisted that she was at its western edge. Our investigation of the evidence has convinced us that neither of these views is correct: but we are satisfied that the schooner must have reached a point sufficiently to the eastward of the western side of the channel to admit of the Illinois passing her as the Gladisfen's

signal required her to do, and this, as it seems to us, is all that it is necessary to determine respecting the schooner's position. The pilot of the Illinois did not suppose that he could not pass with safety to the westward of the tow, for the evidence shows, and the part of the schooner which was struck plainly indicates, that this is precisely what was attempted; and that this attempt was not successful resulted, we think, wholly from the fault of the Illinois. Those on board of that vessel testified that they did not hear the signal of the Gladisfen, but there is no room to doubt that it was given. A steamboat which was alongside of the Illinois, and in a less advantageous situation for hearing, heard it, and, being of light draft, kept out of the way by going over the flats to the eastward. We can see no possibility of excuse for the conduct of the Illinois. She was proceeding in a channel which at this point is quite narrow, and where it was to be expected that vessels and tows might be encountered as in this instance. It was therefore her especial duty to run slowly, and to keep a careful lookout, and to attentively listen for signals; and the record shows that in all of these particulars she failed to exercise even ordinary care. On the other hand, the Gladisfen appears to have done everything which by law or custom she was called upon to do. In addition to the points already considered, counsel has suggested that she ought to have sent a man to the masthead of the Mabel Jordan, that she should have had a watch stationed at the outer end of one of the piers, and that she should have been prepared with means for "snubbing," and should have employed those means to check the progress of the tow from the dock. But none of these suggestions can be accepted. It was not incumbent upon either the tug or the schooner to station a lookout upon the mast of the latter, and we are unable to perceive that a lookout so placed would have been of any use. He might have seen the Illinois sooner than she was seen by the man upon the bow of the tug, but, if he had seen and reported her, still, under the circumstances, the tug would have been justified in proceeding into the river as she did. When she arrived there, the duty was cast upon her to signal the Illinois. This she did, and then the collision occurred, not because the tug had wrongfully issued from the dock, but because the Illinois was so negligently navigated as to render the tug's signal unavailing. A man at the end of the pier would have been in no better position for observing the approach of the Illinois than was the one upon the bow of the tug; but, aside from this, we do not think it was in this case the duty of the tug to set a watch upon the land. As to snubbing the vessel (that is to say, stopping her advance after she had started), what was said by the witness Capt. Hudson is manifestly true. Arrangements could have been made "to have somebody on the tug with some hawser to hold, but you never get a hawser to hold any vessel of any size and weight. It would tear out the chocks and part the line."

We do not deem it necessary to exhaustively review this voluminous record. To what has been said, it must suffice to add that a careful examination of it discloses no error in the judgment of the district court, and it is accordingly affirmed.